# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
### WESTERN DIVISION

United States of America,

       Plaintiff,

vs.

Alexander "Alex" White Plume, Percy White Plume, their agents, servants, assigns, attorneys, and all others acting in concert with the named Defendants,

       Defendants.

Case No.:  02-cv-5071

**Memorandum in Support of Motion for Rule 60(b) Relief [Oral Argument Requested]**

## Introduction

In 2004, this Court (United States District Judge Richard H. Battey) permanently enjoined Oglala Sioux member Alex White Plume from growing and cultivating non-drug industrial hemp[1] on his family's land on the Pine Ridge Indian Reservation. The injunction against Mr. White Plume is the only one of its kind in the United States. In the decade since this decision, state and federal action has significantly altered the legal landscape surrounding Cannabis. Legislatures in four states have legalized marijuana for recreational use, while twelve have both medical marijuana and decriminalization laws, and another nine have legalized medical marijuana. To date, twenty-two states have legalized non-drug industrial hemp. Moved, in part, by this sea change, the

---

[1] Defined in Oglala Sioux Tribal Ordinance as "all parts and varieties of the plant Cannabis sativa, both indigenous and imported, that are, or have historically been, cultivated and harvested for fiber and seed purposes and contain a tetrahydrocannabinol concentration of one percent or less by weight." Oglala Sioux Tribal Ordinance 98-27 (1998) (amending the Oglala Sioux Tribal Penal Code, Title 9, Section 106 (Marijuana) and Section 106.00 (Controlled Drugs and Substances)).

Department of Justice has issued policy guidance memoranda[2] introducing an eight-factor assessment for federal prosecutors that adds discretion to their enforcement of the Controlled Substances Act ("CSA"). Further, in the 2014 Farm Bill, Congress recognized a distinction between marijuana and industrial hemp, creating for the first time an exception to the CSA allowing for the growth, cultivation, and study of industrial hemp in certain circumstances. Because industrial hemp stalks and seeds are often used to make textiles, foods, papers, body care products, detergents, plastics, biofuels, and building materials, the crop has significant economic and environmental value.[3] Under the new Farm Bill paradigm, individual farmers, universities, and state agriculture departments are now able to explore this potential industrial hemp farming bounty.

Given these changes, the injunction against Mr. White Plume is outdated at best. Both this Court and the Eighth Circuit Court of Appeals panel that reviewed the permanent injunction premised their opinions on separation of powers arguments and the inability of the Courts to reinterpret the CSA without legislative action. As will be discussed in greater detail below, both the legislative *and* the executive branches have taken such action. Now, it is time for this Court to recognize these changes and lift the

---

[2]Memorandum from James M. Cole, Deputy Attorney Gen., to all United States Attorneys providing "Guidance Regarding Marijuana Enforcement" (Aug. 29, 2013); Memorandum from Monty Wilkinson, Direct, Exec. Office for United States Attorneys, to all United States Attorneys, First Assistant United States Attorneys, Criminal Chiefs, Appellate Chiefs, OCDETF Coordinators, & Tribal Liaisons providing "Policy Statement Regarding Marijuana Issues in Indian Country" (Oct. 28, 2014).
[3] Logan Yonavjak, *Industrial Hemp: A Win-Win For the Economy and the Environment*, FORBES, May 29, 2013 2:54 P.M., http://www.forbes.com/sites/ashoka/2013/05/29/industrial-hemp-a-win-win-for-the-economy-and-the-environment/.

injunction put in place on Mr. White Plume[4] more than ten years ago. The Court may do so under Federal Rule of Civil Procedure 60(b), and it should invoke that Rule here in the interests of equity and justice.

## Background

### I.      Alex White Plume's history of industrial hemp farming

In 1998, the Oglala Sioux Tribal Council passed tribal ordinance number 98-27 which amended the Oglala Sioux Tribal Penal Code, Title 9, Section 106 (Marijuana) and Section 106.00 (Controlled Drugs and Substances). *United States v. White Plume*, 447 F.3d 1067, 1069 (8th Cir. 2006). The amendment to Title 9, Section 106 provided for a sentence of labor not to exceed six months, or a fine not to exceed $360, or both, for any Indian who farmed, gathered, or dealt in marijuana. *Id*. Section 106(e), which defines "marijuana" for purposes of the penal code, was amended to exclude all parts of the Cannabis plant that contain less than one percent of the chemical tetrahydrocannabinol (THC) by weight. *Id*.

The amended ordinance specifically excluded "industrial hemp" by definition. A definition of industrial hemp was added to section 106.00, describing it as

> all parts and varieties of the plant Cannabis sativa, both indigenous and imported, that are, or have historically been, cultivated and harvested for fiber and seed purposes and contain a tetrahydrocannabinol concentration of one percent or less by weight.

*Id*. Pursuant to the ordinance, Alex White Plume planted and raised a Cannabis crop on his Pine Ridge Indian Reservation land in 2000. Mr. White Plume contracted to sell the

---

[4] Though the injunction applies to Defendants beyond Alex White Plume, this motion seeks Rule 60 relief only for him.

crop to Tierra Madre, a hemp processing company. *Id.* The government learned of the crop, obtained samples of it under a search warrant, and, pursuant to court order, destroyed it.

The next year, Mr. White Plume's brother, Percy, tried his hand at farming Cannabis on the same land. *Id.* As earlier, the government destroyed the crop. That crop was under contract to be sold to another hemp processing company, Madison Hemp. *Id.* at 1070.

In 2002, Alex White Plume planted yet another Cannabis crop on the land, and the government again took samples and discovered very low traces of THC. *Id.* Instead of prosecuting the White Plumes, the government asked the district court to declare them in violation of the CSA and to permanently enjoin them from manufacturing or distributing cannabis. *Id.*

The district court found that the White Plumes had violated the CSA by cultivating, without a DEA registration, hemp—which the court held was included in the definition of marijuana under the CSA. *Id.* It also found that the Treaty of Fort Laramie of 1868 did not preserve any right of the Tribe to grow Cannabis. *Id.* Finally, the court determined that the classification of hemp as marijuana was not irrational and unconstitutional. *Id.* The court ordered the White Plumes permanently enjoined from cultivating Cannabis sativa L. without a valid DEA registration. *Id.*

The Eighth Circuit Court of Appeals affirmed the permanent injunction largely on separation of powers grounds, finding that Congress made no distinction between marijuana and industrial hemp in the CSA, thus preventing the panel from doing

anything but interpreting the "plain language" of the law. *United States v. White Plume*, 447 F.3d 1067, 1072-73 (8th Cir. 2006). The Eighth Circuit acknowledged "the challenges faced by members of the Tribe to engage in sustainable farming on federal trust lands" and granted that "the growing of hemp for industrial purposes [may be] the most viable agricultural commodity for that region" but refused to deviate from what it determined to be black letter law. *Id.* at 1076.

The injunction remains in place today and has prevented Mr. White Plume and his family from exploring the potential for planting or cultivating an industrial hemp crop as allowed by Oglala Sioux Tribal Ordinance for the past 13 years.

## II.    The Cole Memorandum and a changing Cannabis landscape

In August 2013, following state ballot initiatives in Colorado and Washington that legalized under state law the possession of small amounts of marijuana and provided for the regulation of marijuana production, processing, and sale, then-Deputy United States Attorney General James Cole issued a memorandum to all United States Attorneys offering "Guidance Regarding Marijuana Enforcement" (the "Cole Memorandum").[5] The document acknowledged the Department of Justice's commitment to enforcing the CSA but recognized its concurrent commitment "to using its limited investigative and prosecutorial resources to address the most significant threats in the most effective, consistent, and rational way."[6]

---

[5] Memorandum from James M. Cole, Deputy Attorney Gen., to all United States Attorneys providing "Guidance Regarding Marijuana Enforcement" (Aug. 29, 2013).
[6] *Id.* at 1

The Cole Memorandum strikes this balance by setting forth eight enforcement priorities of "particular" importance to the federal government that will "continue to guide the Department's enforcement of the CSA against marijuana-related conduct":

- Preventing the distribution of marijuana to minors;

- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;

- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;

- Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;

- Preventing violence and the use of firearms in the cultivation and distribution of marijuana;

- Preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;

- Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and

- Preventing marijuana possession or use on federal property.[7]

Since issuance of the Cole Memorandum and the related "Policy Statement Regarding Marijuana Issues in Indian Country" ("Wilkinson Policy Statement"), which

---

[7] *Id.* at 2-3.

explicitly made the eight enforcement priorities applicable to United States Attorneys'

marijuana enforcement efforts in Indian Country,[8] federal prosecutors have struck a

balance between protecting the public from the dangers associated with controlled

substances and honoring the actions of state, local, and tribal governments who have

legalized certain cannabis-related activities.

### III.    The Agricultural Act of 2014

In 2014, the United States government joined the Oglala Sioux Tribe in

recognizing the difference between marijuana and industrial hemp. Specifically, upon

signing the Agricultural Act of 2014 on February 7, 2014, President Obama enshrined

into law Section 7606 of the act—subtitled Legitimacy of Industrial Hemp Research—

which, "notwithstanding the Controlled Substances Act," allowed for the growth or

cultivation of industrial hemp under limited circumstances and defined under federal

law "industrial hemp" as "the plant *Cannabis sativa L.* and any part of such plant,

whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more

than 0.3 percent on a dry weight basis." Pub. L. No. 113-79, § 7606, 128 Stat. 649, 912-13

(2014).

With the Agricultural Act of 2014, the Federal government joined the twenty-two

states that have enacted legislation on industrial hemp.[9] Thirteen of these states—

---

[8] Memorandum from Monty Wilkinson, Direct, Exec. Office for United States Attorneys, to all United States Attorneys, First Assistant United States Attorneys, Criminal Chiefs, Appellate Chiefs, OCDETF Coordinators, & Tribal Liaisons providing "Policy Statement Regarding Marijuana Issues in Indian Country" (Oct. 28, 2014).
[9] National conference of State Legislatures, *State Industrial Hemp Statutes* (March 26, 2015),

California, Colorado, Indiana, Kentucky, Maine, Montana, North Dakota, Oregon, South Carolina, Tennessee, Vermont, Virginia, and West Virginia—have statutes allowing commercial industrial hemp programs.[10] The other seven states—Delaware, Hawaii, Illinois, Michigan, Nebraska, New York, and Utah—limit industrial hemp programs to agricultural or academic research.[11]

Under these laws, researchers and commercial farmers are already growing industrial hemp. Several universities in Kentucky, including the University of Kentucky, are growing hemp to research the viability of certain types of hemp seed in Kentucky soil, cultivation for medical research, applications for cleaning tainted soil, and agricultural issues such as production cost.[12] These 2014 pilot projects were extremely successful, yielding substantial data about farming techniques and alternative uses for industrial hemp.[13] Hundreds of applicants sought permits for the 2015 programs in Kentucky.[14] Oregon has also issued its first hemp farming permit.[15] In both states, the DEA and the U.S. Attorney's Offices have neither disallowed hemp farming nor moved to confiscate or destroy the hemp crop.

---

http://www.ncsl.org/research/agriculture-and-rural-development/state-industrial-hempstatutes.aspx (last visited March 30, 2015).

[10] *Id.*

[11] *Id.*

[12] Gregory A. Hall, *Kentucky Announces 5 Hemp Pilot Projects*, USA TODAY (Feb. 17, 2014, 9:11 p.m.), http://www.usatoday.com/story/news/nation/2014/02/17/kentucky-hemp-pilotprojects/5566925/ (last visited July 20, 2015); *see also* Paresh Dave, *After DEA Approves Hemp Seed Import, Kentucky Plants a Landmark Crop*, LA TIMES (May 27, 2014, 5:20 p.m.), http://www.latimes.com/nation/nationnow/la-na-nn-kentucky-hemp-dea-20140527-story.html.

[13] Dan Dickson, *Hemp Pilot Projects Finding Fertile Ground in Kentucky*, BUSINESS LEXINGTON (March 26, 2015), http://bizlex.com/2015/03/hemp-pilot-projects-finding-fertile-ground-in-kentucky/.

[14] *Id.*

[15] Damian Maim, *First Hemp Permit Holder Now Just Needs Some Seed*, MAIL TRIBUNE (Feb. 11, 2015, 6:59 p.m.), http://www.mailtribune.com/article/20150211/NEWS/150219894/101064/NEWS.

## Legal Standard

Because an injunction, "whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making," *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932), a party seeking to modify it "must identify changed circumstances that shift the equitable balance in [its] favor under Rule 60(b)(5)," *Wells Fargo Bank, N.A. v. WMR e-PIN, LLC*, 653 F.3d 702, 715 (8th Cir. 2011). Federal Rule of Civil Procedure ("Rule") 60(b)(5) "permits a party to obtain relief from a judgment or order if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting Rule 60(b)(5)).

Though the Rule "may not be used to challenge the legal conclusions on which a prior judgment or order rests," it "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Id.* (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries that burden, "a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Id.* (citing *Rufo*, 502 U.S. at 383, and quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

Rule 60(b)(5) permits relief from a judgment where "[i] the judgment has been satisfied, released or discharged; [ii] it is based on an earlier judgment that has been reversed or vacated; *or* [iii] applying it prospectively is no longer equitable." (Emphasis added.) As the Supreme Court held in *Horne*, the "use of the disjunctive 'or' makes it

9

clear that each of the provision's three grounds for relief is independently sufficient and therefore that relief may be warranted even if petitioners have not 'satisfied' the original order." 557 U.S. at 454. Thus, a petitioner "may obtain relief if prospective enforcement of that order 'is no longer equitable.'" *Id.* It is "well settled a district court retains authority under Rule 60(b)(5) to modify or terminate a continuing, permanent injunction if the injunction has become illegal or changed circumstances have caused it to operate unjustly." *Assoc. for Retarded Citizens v. Sinner*, 942 F.2d 1235, 1239 (8th Cir. 1991).

Motions under Rule 60(b) must be brought "within a reasonable time." Fed. R. Civ. P. 60(c)(1). The rule does not specify the precise time period in which motions under 60(b)(4)-(6) must be brought. The Eighth Circuit has held that "[w]hat constitutes a reasonable time is dependent on the particular facts of the case in question." *Watkins v. Lundell*, 169 F.3d 540, 544 (8th Cir. 1999). In determining whether the timing of a Rule 60 motion is reasonable, the court considers "the movant's reason for delay and the existence of any prejudice to the opposing party." *Schultz v. Commerce First Fin.*, 24 F.3d 1023, 1025 (8th Cir. 1994) The Eighth Circuit has found the time for filing a Rule 60 motion reasonable, for instance, where the defendant filed two months after becoming aware of a five-year-old default judgment. *U.S. v. Five Thousand Dollars in United States Currency*, 184 F.3d 958, 960 (8th Cir. 1999). The Eighth Circuit has also held that it is not unreasonable for a party to "[wait] until all avenues of appeal [have] been exhausted before filing its motion." *Harris v. Union Elec. Co.*, 846 F.2d 482, 485 (8th Cir. 1988).

## Analysis

**I.      Congressional and executive action have significantly changed the legal landscape for industrial hemp, justifying Rule 60 relief for Mr. White Plume.**

In granting the United States' motion for summary judgment and permanently enjoining Mr. White Plume from manufacturing and distributing industrial hemp, the District of South Dakota evaluated the four *Dataphase* injunction factors and rejected Mr. White Plume's defenses based on Congress' definition of marijuana in the Controlled Substances Act. It addressed *Dataphase* by noting that "Hemp is included in the [CSA's] definition of marijuana," that Congress "determined that marihuana was among those controlled substances with 'a high potential for abuse,'" and that "Congress has determined that cannabis presents a threat to the public." *United States v. White Plume*, No. CIV 02-5071-RHB (D.S.D. Dec. 28, 2004) at 6-7 (citing to 21 U.S.C. § 812(b)(1)(A)). And it countered Mr. White Plume's challenge to the CSA's applicability to industrial hemp in the same manner, finding that "Congress specifically made it illegal to possess marihuana which it defined as 'all parts of the plant Cannabis sativa L.' . . . Hemp is a variety of Cannabis sativa L. As a result, the plain language of the statute prohibits the cultivation of hemp without a valid DEA registration." *Id.* at 7 (citing 21 U.S.C. § 802(16) (internal citations omitted)). Finally, it rejected Mr. White Plume's argument that hemp was "readily distinguishable" from marijuana by finding that "hemp and marijuana are different varieties of the *same* plant," and that Congress was "legitimately attempting to regulate the use of marijuana." *Id.* at 10 (emphasis in original).

11

The Eighth Circuit relied on similar reasoning in affirming the district court's decision. It held that "Congress clearly defined 'marijuana' as Cannabis sativa L. in the CSA," finding Mr. White Plume's argument that Congress did not intend to criminalize the growing of marijuana for industrial purposes "plausible, but ultimately not persuasive, for [the court was] bound by the language of the CSA." *White Plume*, 447 F.3d at 1071, 1072. It expounded upon its limitations: "Essentially, what [Mr. White Plume] seek[s] from this court is amendment of the CSA. But the proper venue for amending a statute is, of course, the duly elected legislature, equipped as it is to make those policy decisions." *Id.* at 1072. Ultimately, the panel decided that because "the CSA does not distinguish between marijuana and hemp in its regulation, and because farming hemp requires growing the entire marijuana plant which at some point contains psychoactive levels of THC, the CSA regulates the farming of hemp." *Id.* at 1073. It ended its opinion in the same vein, recognizing the validity of Mr. White Plume's many arguments but finding them "better suited for the congressional hearing room than the courtroom," and noting that it fulfilled its "role to interpret and apply the statute as written by Congress." *Id.* at 1076.

At both the district and appellate court level, the judges weighing Mr. White Plume's case invoked separation of powers arguments for their decision, highlighting their constrained role to act because of plain statutory text. The years since the summary judgment decision and appeal have seen substantial movement by the other branches of government, and those changes have now fundamentally altered the legal reasoning underlying the *White Plume* decisions.

12

A.   **Congress reinterpreted the CSA's classification of industrial hemp in the Agricultural Act of 2014.**

In the Agricultural Act of 2014[16], Congress distinguished between varieties of the Cannabis sativa L. plant, separately defining "industrial hemp" as "any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." Pub. L. No. 113-79, § 7606, 128 Stat. 649, 912-13 (2014). It did so "notwithstanding the Controlled Substances Act," thereby demonstrating an appreciation of its conscious shift in approach to the question of industrial hemp. *Id.* By drawing, for the first time, a distinction between marijuana and industrial hemp, Congress effected a "significant change" in the law that calls for this Court to reconsider the continued application of the permanent injunction against Mr. White Plume. *See Rufo*, 502 U.S. at 384. Indeed, the Act's definition of industrial hemp includes the very characteristics of the crop that Mr. White Plume highlighted before this Court and at the Eighth Circuit—namely, its purpose (industrial, not medicinal) and a THC content that eliminated the possibility of it being used for psychotropic purposes. *Compare White Plume*, No. Civ. 02-5071-RHB (D.S.D. Dec. 28, 2004) at 10, *with White Plume*, 447 F.3d at 1071, 1073, *and* Pub. L. No. 113-79, § 7606, 128 Stat. 649, 912-13 (2014).

The Agricultural Act of 2014 discusses industrial hemp in a limited context, restricting farming of industrial hemp to (1) locations where "the growing or cultivating of industrial hemp is allowed under the law of the State" and (2) for research purposes

---

[16] Pub. L. No. 113–79, § 7606(a), 128 Stat. 649, 912-13 (2014) (referencing the Higher Education Act of 1965's definition of an "institution of higher education").

involving "an institution of higher learning" or "a State department of agriculture." *See* Pub. L. No. 113-70, § 7606(a)-(b). The Act, though narrow, has allowed farmers in states like Kentucky and Oregon to work with institutions of higher learning or State departments of agriculture to grow and cultivate industrial hemp, while the permanent injunction against Mr. White Plume prevents him from even exploring the same opportunities.

This is wrong because, for the purposes of industrial hemp regulation under the Agricultural Act of 2014, the Oglala Sioux Tribe's legalization of non-drug industrial hemp should be treated the same as, say, the State of Kentucky's legalization of non-drug industrial hemp. The Marshall Trilogy—a series of Supreme Court cases underlying modern federal Indian policy—supports this interpretation.

In *Cherokee Nation v. Georgia*, the Court held that although tribes are not states of the union, they are not foreign nations as contemplated by the constitution either but are in fact "states" insofar as tribes are distinct political entities. 30 U.S. 1, 16 (1831). The Court acknowledged that tribes had been "uniformly treated as a state from the settlement of our country." *Id. Worcester v. Georgia* further clarified that state laws have no force on reservations. 31 U.S. 515 (1832). Applying these precedents, tribes have the exclusive authority to regulate industrial hemp farming on tribal land. Unless a federal statute, treaty, or executive policy prohibits or limits tribal sovereignty with respect to industrial hemp regulation, the tribe is free to enact its own policies. *See Nat'l Farmers Union Ins. Co. v. Crow Tribe*, 471 U.S. 845, 852–53 (1985) (holding that litigants arguing the tribe's lack of authority "must contend that federal law has curtailed the powers of

14

the Tribe"). Given the Marshall Trilogy, the federal government must respect the Oglala Sioux Tribe's sovereignty and find that the permissive language of the Agricultural Act of 2014 which allows limited cultivation of industrial hemp in "States" that have legalized it applies as well to the Oglala Sioux Tribe's decision to allow industrial hemp farming in its jurisdiction.[17]

Because the government has not pointed to any treaty or federal policy that divests tribes of the right to regulate industrial hemp farming on tribal lands (and indeed cannot do so), under the Agricultural Act of 2014, tribes are entitled to enact their own laws regarding industrial hemp farming. The Drug Enforcement Administration and the Department of Justice must respect these laws in their implementation of federal policy, including the Controlled Substances Act. Mr. White Plume should be permitted to explore farming industrial hemp, just as farmers in Kentucky and Oregon have done. Only lifting the injunction will put Mr. White Plume and the Oglala Sioux Tribe on a level footing with farmers and States around the country and cure an inequitable and outdated interpretation of the CSA.

### B.   The Department of Justice allowed for discretion in Cannabis-related enforcement actions with the Cole Memorandum and Wilkinson Policy Statement.

In addition to Congress, the Executive Branch has also undergone a change in its approach to Cannabis since the injunction against Mr. White Plume took effect. With

---

[17] This analysis applies not just to the Oglala Sioux Tribes decision to legalize of industrial hemp in its jurisdiction, but also to the potential of a tribal college or tribal department of agriculture to serve as the partner for industrial hemp research. In Mr. White Plume's case, that could mean a partnership with the Oglala Lakota College, an institution of higher learning as defined by the Act, to explore industrial hemp farming research on the Pine Ridge Indian Reservation.

the August 2013 Cole Memorandum, the Department of Justice signaled a new era in its enforcement of the CSA against marijuana-related conduct.[18] By setting forth eight factors to guide such enforcement actions, the Department of Justice introduced discretion to the equation—the very discretion that this Court and the Eighth Circuit previously felt unable to exercise. With the 2014 Wilkinson Policy Statement, that discretion was explicitly extended to Indian Country and to Tribes like the Oglala Sioux who have decided to legalize Cannabis, including non-drug industrial hemp, in their jurisdiction.[19]

Together, the Cole Memorandum and Wilkinson Policy Statement confirm the significant changes in United States marijuana-related drug enforcement in the past 24 months, and they, too, weigh heavily in favor of Rule 60(b)(5) relief for Mr. White Plume. For all of these reasons, Mr. White Plume requests that the Court act under Rule 60(b)(5) and lift the permanent injunction preventing him from growing and cultivating industrial hemp at the Pine Ridge Indian Reservation.

## II.    Under the Cole Factors, the Department of Justice should not expend resources to maintain and enforce the injunction.

Since issuance of the Cole Memorandum and the Wilkinson Policy Statement, federal prosecutors have worked to protect the public from the dangers associated with controlled substances while honoring the actions of state and local governments who

---

[18] Memorandum from James M. Cole, Deputy Attorney Gen., to all United States Attorneys providing "Guidance Regarding Marijuana Enforcement" (Aug. 29, 2013).
[19] Memorandum from Monty Wilkinson, Direct, Exec. Office for United States Attorneys, to all United States Attorneys, First Assistant United States Attorneys, Criminal Chiefs, Appellate Chiefs, OCDETF Coordinators, & Tribal Liaisons providing "Policy Statement Regarding Marijuana Issues in Indian Country" (Oct. 28, 2014).

have legalized certain marijuana-related activities. The Cole Memorandum-CSA enforcement paradigm should apply with equal force to Mr. White Plume as it does to hemp farmers in Kentucky and Oregon. Under this new approach, the Department of Justice's limited resources should not be spent impeding Mr. White Plume's industrial hemp farming plans at Pine Ridge, which implicate none of the Cole Memorandum's eight enforcement priorities.

As a general matter, the Cole factors are inapplicable to Mr. White Plume because his hemp crop *cannot* be used for any psychoactive effect. Marijuana, in the traditional medicinal, recreational, or spiritual context, involves Cannabis flowers that contain 5-10% or more of tetrahydrocannabinol (or THC)—the compound responsible for marijuana's psychoactive effect if present in a high enough percentage. Industrial hemp, by contrast, involves the use of the cannabis stalk and seeds for textiles, foods, papers, body care products, detergents, plastics, and building materials. It contains a THC concentration of 1% or less by weight. Put simply, given this THC level, it is impossible to use industrial hemp for any psychoactive effect and therefore extremely unlikely that the cultivation of industrial hemp could ever implicate any of the Cole factors.

Mr. John Salley, a special agent with the Drug Enforcement Administration ("DEA"), testified that one sample of Mr. White Plume's industrial hemp tested by the

17

University of Mississippi showed absolutely no traces of THC.[20] Because THC is the chemical component of marijuana that causes psychoactive effects, industrial hemp plants with negligible THC content, like Mr. White Plume's crop, cannot be used as a drug to achieve the psychoactive effects that marijuana causes. Mr. White Plume's cultivation cannot possibly contribute to the sale of marijuana to minors or to driver impairment under the influence of marijuana.

Additionally, Mr. White Plume's proposed industrial hemp cultivation does not implicate any of the Cole factors concerned with organized or violent crime. Mr. White Plume is a former Vice President if the Oglala Sioux Tribe and an honorably discharged veteran. He has never been involved in a drug cartel or engaged in illegal drug trafficking or gun violence in any context, let alone in connection with his hemp farm. The DEA and Department of Justice have never suggested that they believe that he has done or will do any of these.

The DEA and Department of Justice have also never suggested that Mr. White Plume intended to possess industrial hemp—let alone marijuana—on federal property. Mr. White Plume's hemp farming operation would take place exclusively on the Pine Ridge Indian Reservation, and any processors or other purchasers would be purchasing the hemp to be processed on private property.

Because Mr. White Plume's proposed hemp farming does not implicate any of the Cole factors, it should not be considered an enforcement priority. The DEA and

---

[20] Transcript of the testimony of John C. Salley at 24, *United States v. White Plume*, Civ. No. 02-5071-RHB (D.S.D. 2002).

Department of Justice should not spend their finite resources to enforce or uphold an injunction that prevents Mr. White Plume from engaging in a business that is perfectly legal under Tribal Ordinance and the Agricultural Act of 2014. To do so would not only treat Mr. White Plume differently than similarly situated farmers in Kentucky and Oregon. It would also ignore the purposes of the Cole Memorandum and the Wilkinson Policy Statement.

### III.    Mr. White Plume has filed this Rule 60 motion within a reasonable time.

This Rule 60(b) motion is brought within a reasonable time given the facts and circumstances of this case. Since the Eighth Circuit affirmed the injunction against Mr. White Plume in 2006, the legal landscape has changed considerably. In recent months and years, numerous states and localities have legalized medical marijuana, recreational marijuana, and industrial hemp farming. The Cole Memorandum, issued less than two years ago and applied definitively to Indian Country just nine months ago, signaled a significant policy change to the enforcement of laws directly impacting Mr. White Plume and the injunction against him. The Agricultural Act of 2014 also altered the legal landscape with respect to industrial hemp. These changed circumstances are the essence of Mr. White Plume's claim under Rule 60(b). Given how recently these policy changes occurred, Mr. White Plume could not have brought this motion sooner.

Mr. White Plume also attempted to exhaust his options for non-judicial relief before filing this motion. In April, Mr. White Plume's attorneys contacted Randolph Seiler, Acting U.S. Attorney for the District of South Dakota, asking that the injunction be lifted given the changed legal circumstances. On June 4, 2015, Mr. Seiler responded,

denying this request. This motion, filed less than two months after that denial, is brought within a reasonable time as required by Rule 60.

## Conclusion

Significant changes in the country's Cannabis-related laws and the way in which they are enforced have altered the legal landscape under which Alex White Plume was subjected to a permanent injunction preventing him from growing and cultivating industrial hemp. Under such circumstances, Rule 60(b) relief is required to prevent the inequitable application of the prior prospective order. Granting this relief would restore to Mr. White Plume the opportunities granted to other industrial hemp farmers throughout the United States while appropriately conserving federal enforcement resources. For these reasons, Mr. White Plume respectfully asks this court to grant his motion for Rule 60 relief and vacate the injunction against him.

Dated: July 29, 2015

s/Ronald A. Parsons Jr.
Ronald A. Parsons Jr.
Delia M. Druley
Johnson, Abdallah, Bollweg & Parsons, LLP
101 South Main Avenue, Suite 100
Sioux Falls, SD 57104
T: 605-610-2188
F: 605-338-4162
ron@johnsonabdallah.com
delia@johnsonabdallah.com

Timothy Q. Purdon (pro hac vice motion pending)
Michael D. Reif (pro hac vice motion pending)
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402

T: (612) 349-8500
F: (612) 339-4181
tpurdon@robinskaplan.com
mreif@robinskaplan.com

*Counsel for Defendant Alexander White Plume*